Case No. 15-1449, SecurityPoint Holdings, Inc. Petitioner v. Transportation Security Administration. Mr. Graveline for the Petitioner. Mr. Capel for the Respondent. Mr. Graveline, good morning. Good morning. May it please the Court. My name is Brad Graveline from the law firm Shepard Mullen, and I represent the Petitioner, SecurityPoint, in this case. This is the second time we've been before the Court on very similar issues. SecurityPoint contends that TSA inserted indemnification language into MOUs in order to retaliate against SecurityPoint for filing a patent infringement case against the TSA. We also contend that the TSA's insertion of the indemnification language is arbitrary and capricious and not the result of reasoned decision-making. And as a result, SecurityPoint requests that TSA remove the indemnification language from the MOU. Just by way of quick background, the MOUs are required by TSA. TSA requires that airport operators in the TSA enter into the MOUs before the advertising brokers can provide their services into the airports. And if the airport operators provide their services to the airports, they are able to provide advertising on the bottom of the trays that you see when you pass through security screening checkpoints. On October 28, 2014, this Court held that TSA's attempt to insert the indemnification clause into the MOU was arbitrary and capricious and remanded the case to TSA. The Court held that TSA failed to consider two important factors. First, that airports could not agree to the indemnification language. And second, that TSA failed to consider the harms that would result to TSA from insistence on the indemnification provision. The Court also awarded SecurityPoint its attorney's fees for that matter. On remand, TSA made a single change to the indemnification language. And what it did is it offered airport operators the option, it referred to it as an option, of requiring the advertising brokers to provide the indemnification to TSA. SecurityPoint contends that this change remains arbitrary and capricious. To SecurityPoint's knowledge, it currently is the only advertising broker participating in the BIN advertising program. So if SecurityPoint is the advertising broker, and if the airport operators were to exercise the option of requiring SecurityPoint to provide the indemnification, what that would mean is that SecurityPoint would be indemnifying TSA for infringing SecurityPoint's patent at all time that TSA was infringing the patent. We contend that that is not a legitimate option, and obviously SecurityPoint would not provide that indemnification. Even in the event that a different... Would you just restate that? I'm sorry. Yes. So if SecurityPoint is the advertising broker, and if the airport operator were to require the advertising broker to provide the indemnification, SecurityPoint would be indemnifying TSA for infringing SecurityPoint's patent. Well, that doesn't cost you anything. Well, but the difference is, Your Honor, the language that SecurityPoint proposed to TSA was a covenant not to sue, and SecurityPoint would provide a covenant not to sue during periods of time that the MOU was in place, because SecurityPoint would be receiving compensation during... So what are you worried about, other intellectual property? We're not concerned. We don't believe there is any other intellectual property. So then I don't get what the concern is. The concern is that SecurityPoint would be providing indemnification even for periods of time that the MOU was not in place. So if TSA was infringing the patent prior to the MOU being in place, SecurityPoint would be providing indemnification for a period of time before then with no compensation. We would be surrendering our patent. You're already in litigation with them. Correct. And it prevailed in the first instance. Correct. You would not be writing that off. Well, I believe, Your Honor, that under the language that TSA has proposed, we would be, because... It would be retroactive? The language is very broad. It says that SecurityPoint... Well, if you get the government to acknowledge that it's not retroactive, does that solve your problem? We'd have to see the language, but certainly under the language that they have proposed, it would not be acceptable because it would require SecurityPoint to surrender its patent rights up until the time that the MOU was in place, which we believe is not a realistic option. Is this point made in your brief? It is, Your Honor, yes. I didn't understand it as relating to a concern about the existing judgment. The existing judgment? Yes. The current suit. It's been in your favor, right? A great deal of money. No. So what has happened in the Court of Federal Claims litigation is the case was bifurcated. So right now, what we have is... Oh, I'm sorry. Yes. You have a finding of validity? Validity, correct. Yeah. Yeah. And so continuing then, if some different advertising broker... So what's the current status of that? So you have a finding of validity? Yes. We have a finding of validity by the Court of Federal Claims, and we are currently engaged in discovery about the damages question, at least with regard to a certain number of airports that the parties have selected to proceed with. Yeah. But that's not going to happen, is it? Exactly. So that's good for you. You have a monopoly. Well, but I think the point is that the language that TSA inserted into the agreement is arbitrary and capricious and not the result of reasoned decision making. But what's the harm to you of making it impossible for other brokers to get an MOU? Well, our point is that nobody could agree to the indemnification. So let's stick to you. Okay. Because insofar as it's nobody, it's a benefit to you. I suppose it would be, but it still is not the result of reasoned decision making because what has happened is that TSA has inserted indemnification language into the MOUs that simply doesn't make sense. So the only change with regard to the indemnification language that TSA provided after remand was inserting the option that the advertising broker could provide the indemnification. So, as I've noted, it wouldn't make sense with regard to security point, but it further would not make sense with regard to any other advertising broker. As your Honor mentioned, there already has been a finding that the patent is valid. TSA has acknowledged that the damages could be very significant in this case, so certainly no other advertising broker would agree to that language. And the justification that TSA has put forth for that indemnification language is exactly the same as what was before the court previously. They provided a declaration of a TSA IP attorney by the name of William Washington. That declaration was before the court during the prior appeal. Mr. Washington has said that the indemnification language was the result of a comprehensive review of potential legal liability, but there's no evidence that that actually took place. And so what we have here is the only justification is a post hoc litigation affidavit provided by Mr. Washington. And I'd like to put forth... But they have a much lengthier explanation than they did before, right? I don't believe they do. I believe that what they have provided is exactly what they said before, and their justification is that the indemnification language is necessary as part of a legal review and that there may be some other intellectual property out there that TSA is concerned about. But the Washington declaration does not identify any of that other IP that might be out there that could potentially be infringed. And the Washington declaration was not provided until after Security Point raised the issue about the indemnification in this litigation. So prior to 2011, there were about 40 airports that entered into the BIN advertising program. This was before any indemnification language was inserted. After that time, or I'm sorry, even before 2011, TSA began using the patented method at all of the other airports. There's about 400 airports in the country. Forty of them have MOUs. TSA began using the patented method at all of the other airports. In May of 2011, Security Point filed the patent infringement language, and then after that, in August of 2012, TSA added the initial indemnification language. We objected to that in December of 2012 and January of 2013 by writing letters to TSA stating that the indemnification language does not make sense. It would preclude airports from entering into the MOUs with the airport operators. But then some did. Some airports did enter into the MOU. You know, I don't believe that's the case. In the government's brief, they have put forth the MOUs that are signed by Boston, two airports in Rochester, and Durango. There is no evidence at all that any of those airports actually entered in or actually have participated in the BIN advertising program. So there are signed MOUs, but none of those airports have actually participated in the BIN advertising program. What's the difference as far as the point you're raising? What's the difference between signing the MOU and implementing it or getting a broker? It could be, Your Honor, that after they signed it, they realized that they would provide this indemnification, and then they could not participate in the BIN advertising program. That's speculation. Well, the government, in this case, bears the burden of proof. So it's up to the government to provide evidence that its order was the result of reasoned decision-making. When they entered into an MOU with the operator, the passport or whatever, it's not really within their reach to say why the operator didn't follow through, is it? Your Honor, it's up to the government to prove. They have the burden of proof that the new language was the result of reasoned decision-making. And the MOUs that those few airports have signed… But you seem to be ruling out the possibility that reasoned decision-making would not lead to this program being implemented. And a reasoned decision might indeed lead to just that, no program at all, perhaps. That is perhaps the case, but the government still has the burden of showing that its insertion of the indemnification language was the result of reasoned decision-making. But all that goes not to whether the other airports ever sign on or whether it's practical to implement, but whether the reasons given for having it make sense, right? And if they're protecting themselves, or so they say, from IP liability. That is what they say, Your Honor. But the reality is, in the evidence that TSA has put forth, there is no evidence whatsoever that they actually conducted that sort of a review. Well, there's an affidavit from the man who says he reviewed 50 procurement-type contracts. And if that were the case, the government could have put forth other contracts where they inserted that indemnification language. That doesn't follow. If they reviewed, we don't know what they put into other contracts or what changes they recommended. But whether they made no other changes at all is irrelevant. If they went through a comprehensive review, examined 50 contracts, did whatever they thought was appropriate for each one, all we know about is yours. I mean, if it didn't make sense for them to protect themselves from intellectual property liability, you'd have a compelling case. But it obviously makes sense for anyone to do that. In certain situations, it might. And if that is what TSA actually did, they could have put forth additional evidence of that. The only evidence. It seems to me that all you're saying must go to your motive point. It does go to motive. And I think the evidence is clear. Somehow we alighted into motive from whether this was reasoned decision-making. And I believe this is not reasoned decision-making, and this is clear retaliation against Security Point for filing the patent case. And I think when you have a situation where you have these e-mails from the TSA employee who was tasked with implementing and running the program, who said, we are not going to be pushed around by Security Point. I think that that we would submit. He's not the person of relevance here. Why is it not inherently rational once they've encountered a law case in which the validity of your patent has been upheld to make sure that the damages don't keep on accumulating? Well, what they have done here, this happened all after the fact. And so the only evidence that we have that this review was actually done is the affidavit of Mr. Washington, which does not provide any critical details. It doesn't indicate which contracts he reviewed. It doesn't indicate when. Why do we care which contracts he reviewed? Ain't the courts interested in that? Well, Your Honor, our contention is that what the government has done is they have put forth this affidavit to cover up their retaliation of Security Point for filing the patent case. But if it were not in their self-interest to avoid further damages to you and possible damages to others unknown, that would make sense. But clearly it's in their interest not to accumulate damages. And that's not retaliation. That's just prudence. But the retaliation occurred before any of this happened. So we have the e-mails from Mr. Drenth saying, and this is before we had a validity decision, saying that – But you were already in litigation, were you not? We were in litigation, yes. Okay, that's – the point stands then. It's not quite as obvious. But if you've been sued, you've got a patent that could be upheld, why would I just go on accumulating potential damages? Well, if that were the case, Your Honor, there would never be a situation. The government could, any time a patent infringement case were asserted against the government – They could stop violating it. They could stop violating it. If they'd been sued for violating a patent, they could stop violating it. They could stop violating it, yes. That would make a lot of good sense, wouldn't it? Yes, it would, yeah. It's not retaliation to do that. It's good sense. But that's not what they did. They are continuing to violate the patent. The method is still being used at all of the other airports. So what we have here is – Only if they're – well, pardon me. The ones that had MOUs before are still operating, is that what you're saying? It's operating everywhere. At the 40? At the 40, as well as at the 360 or so additional airports that do not have MOUs. So the government is continuing to infringe the patent. But they have contracts with those people, right? They do not. So let me understand this. They're operating at 400 airports. Correct. Just doing it themselves. Doing it themselves. And they have no contract with the airport to do this? Not to use the method that is provided by Security Point. There is no MOU in place at those 360 or so airports. Is there any contract with those airports? So they just come in and do what they want to do? I believe that TSA just came in and began using the patented method without providing any compensation to Security Point and without entering into MOUs with the airport operators. So when I've seen these TSA employees pick up a bunch of bins and move them, that was before this all occurred? Yeah, that was – so what happened is in about 2008, TSA began using the patented method nationwide. So what you currently see is the method being used where the trays are returned on the carts. And TSA is using that method without providing any compensation to Security Point. And under the MOUs, Security Point was getting at least some amount of compensation by providing the advertising. What TSA has done is TSA is using the method, providing no compensation to Security Point and preventing Security Point from providing advertising, getting revenue from that, because it's cut off the possibility that any additional airports could ever enter into an MOU. So the question to be addressed to the government is, if you altered the prescribed form of the language to avoid liability, then why are you continuing to accumulate potential liability? I think that's exactly the question. And Security Point's business is being decimated by the government's actions. So can I just ask you, in the ongoing litigation, is all of this in play with respect to the damages? All of the airports are in play with respect to damages, yes. So the 40 airports or whatever you said that's going on without the agreement in place, that's all factoring into the calculation of liability? It is factoring in. During the periods of time that those airports had an MOU,  but the government would still be subject to damages during periods of time that the MOU was not in place. All right, we'll give you a couple minutes. It was never in place in most of these airports? Never in place in most of the airports, yes. We'll give you a couple minutes to reply. Okay, thank you very much. Mr. Koppel? May it please the Court, I'm John Koppel from the Appellate Staff Civil Division, U.S. Department of Justice, and I'm representing the Respondent Transportation Security Administration on this petition for review. At the outset, I don't have a great deal to add to our brief and to the colloquy between Judge Ginsburg and opposing counsel. I would emphasize that TSA complied fully with this Court's remand order to engage in reasoned decision-making and to respond to the various contentions that Security Point made that this Court suggested in its earlier decision warranted a response from TSA. Can you address the retroactivity question that came up in the first argument? Well, yes. The changes made by the MOU were prospective in nature. They were not retroactive. This was simply a matter going forward for new airport operators that chose to enter into the program. It didn't affect the current participants in the program, the approximately 44. Does it affect the ongoing litigation? So, in other words, I took the argument that was made earlier to be that the MOU could be read to have an impact going back on the subject of the ongoing patent litigation. I don't believe that it does, Your Honor. I believe that it was prospective only in order to essentially to cut off prospectively the very type of problem that had been raised by the Security Point patent litigation. For those airports and brokers who chose to enter into the MOU? Excuse me? Prospectively with respect to those airports and brokers who chose to enter into the MOU? Right, which would be new ones. It would not be the ones that were already in the program. There are about 44, I believe, and this is in the agency's decision. There are approximately 44 airports total out of more than 450 that participate in the program. Security Point is the broker in 40 or 41. I believe it was originally 41, but one, San Diego, has dropped out. Contrary to what opposing counsel stated, there have been other brokers in the process. I believe at least three other brokers in the process since November of 2012. Again, that is also in TSA's decision. But more importantly, whether or not even brokers, others have entered the program, it is clear that four airport operators, including Boston Logan Airport, which is one of the country's largest, have entered into MOUs using the new language. And that in and of itself refutes Security Point's argument that this is a poison pill that would prevent airport authorities from entering into the program. So that is really a red herring, as is the other argument that TSA didn't factor, didn't consider the benefits and the costs of the changes to the MOU, because TSA explicitly considered that with respect to the five airports that Security Point had identified as declining to enter into the new MOU. And the agency determined that given that it does indeed operate already using the carts, bins, and trays, there really were no benefits because its only costs were marginal replacement costs. And Security Point wanted the agency to basically compare those against the startup costs, the $435,000 that were mentioned with respect to the pilot program affecting 14 airports. And that was truly an apples and oranges comparison. Because TSA is already using the carts, bins, and trays system at all other airports, including the five airports that were identified by Security Point as rejecting the new MOU, TSA would not incur significant financial benefit. And it weighed that against the prospect, the substantial prospect of further potential patent liability. Mr. Koppel, that's where I wanted to get some clarification. Your justification for the changes are to protect the agency from additional IP liability, and yet you're continuing to practice the patent at nearly 400 airports. That is true. Well, if you were trying to protect yourself from liability, I should think you would stop practicing the patent at the 90% of the airports. Well, of course, TSA is contesting the patent litigation. But if you're saying we changed the MOU to avoid accumulating liability over here, and meanwhile we're continuing to accumulate potential liability over there, then it makes hash of the explanation. Well, Your Honor, I respectfully disagree. The MOU is only focused on the relationship between the airport operator and TSA. Which is 10% of the airports. But potentially it is much more, and potentially it's however many choose to enroll in the bin advertising program. It could affect all, conceivably it could affect all airports. It's just a matter of- Meanwhile, all airports have not signed up. And even if they all did in the near future, from the time you redrafted the MOU until such time as someone picks up the liability through an indemnification agreement, it's on you. If there's liability, you're burying it.  Well, that is correct, Your Honor. But you've come in and said that the whole reason for redrafting the MOU was to avoid infringement liability. Well, it is- It seems like a very prudent step. Until one realizes that you're just sticking one finger in a dike that's already broken. Well, it's to avoid infringement liability in the bin advertising program, and as opposed to- But that liability arises not from the bin advertising program, but from the use of the carts. From the use of the- And you're using carts. Of the system, yeah. That is true. All right, so we have two choices here. Either the people who came up with the amendments are not very smart, or it's a pretext. Well, Your Honor, I certainly- I would- Well, maybe I'm missing something. I thought your explanation was that- I thought the government's stance was that with respect to everything that's happened to date, you don't think it's a problem, but that's ongoing in litigation. With respect to stuff that's happening in the future, you're just taking out- you're just getting extra assurance that it won't be a problem in the future. It's not to the exclusion of contesting liability with respect to everything that's already on the books to date. That's correct, Your Honor. It's just that you're being extra careful going forward. Exactly, Your Honor. Except you're being extra careful only in the 40-some airports. In the others, you're just- You're rolling the dice. You're just rolling the dice. Right. It's only in the BIN advertising program. The agency, which of course is the focus of this litigation, there's no way that the agency can take steps to avoid liability with respect to the other airports except by not using their system because Security Point continues to argue that that violates- So is the answer that the system is essential? Well, TSA obviously feels that the system is beneficial, that it works, and it's an effective method. It's somebody else's, or it might be somebody else's method. Well- It's very peculiar. I mean, I was trying to- It may be that this is the sensible thing to do, but the explanation given for changing the MOU doesn't address- which is to say prudence in avoiding liability- doesn't address the larger context in which you're potentially incurring liability. But it does address it completely with respect to the BIN advertising program. Yes, it does. Yes. But of course- So your answer is that you can't stop using the cards. You just have to take your chances. That is essentially the decision that TSA has made. Of course, TSA is challenging the validity of the patent and is appealing the adverse liability decision. TSA believes that it's an obvious method, and therefore the patent is invalid. So that is- But you're hedging with regard to the 40 airports, any airports that enter into an MOU. Well, TSA obviously is trying to reduce its exposure with respect to the BIN advertising program. So then turning to the First Amendment retaliation claim, that also-given the reasons that TSA has provided with respect to the APA claim, that also essentially takes care of the First Amendment violation claim. The dispute there is really over the standard, whether the Pickering standard should apply in this context or whether it should just be a more general retaliation standard. But the government should win under either of those standards, which are very similar, as we have pointed out in our brief. But with respect to Pickering, the key point is that this really is not a matter of public concern. This is essentially a private dispute. I'm not quite sure I understand how Pickering applies here, because I thought the whole predicate for Pickering is that the government essentially acknowledges that it takes an action against a government employee because of speech, but then it says it has latitude to do that because it has to be able to manage the workplace. But here the argument that's being put forward by the government is that we didn't take an action because of speech. So it just seems like an odd effort to use Pickering, because Pickering presupposes that action was taken because of speech. And then the question is, well, even if that's true, it's still okay in some situations because the government gets to manage its employees. Whereas here we have a predicate dispute about whether this is a response to the speech in the first place. Right. Which seems like an odd context in which to apply Pickering. Well, I think that it's sort of that the point is well taken, that the First Amendment argument really only comes into play if the government's explanation is rejected as arbitrary and capricious because it does presuppose what you've suggested, that it was based on speech. But the key point is that even if it were to be said to be based on speech, not only is it not a matter of public concern, but it's also there's no animus here. As the Court has emphasized, this is simply an effort on TSA's part to protect itself with respect to potential exposure to liability in the VIN advertising program. And given that, the notion that it's retaliation just simply does not fly. There, I believe that we've really, we've essentially covered the subject matter here. And if there are any, I'm prepared to answer any further questions and rest on the briefs. I urge the Court to deny the petition for review. Thank you. All right. All right, why don't you take two minutes if you feel you need them. Just a few points that I would like to make briefly. I think the facts here are clear. Security Point filed a patent infringement case against the government. And in response, the government retaliated by taking an action that decimated Security Point's business. It prevented Security Point from signing up any additional airports, and that evidence is uncontradicted. The government has put forth no evidence whatsoever that any airports have agreed to the language and actually gone into airports and provided the advertising, the VIN advertising program, after the indemnification language was inserted. With regard to the four airports, there is no evidence that any of those airports actually are participating in the VIN advertising program. And there is no evidence at all that any airport actually signed an MOU with the new language that TSA has inserted with this new indemnification option. I wanted to emphasize. Does that? Let's suppose that everything you just said is not only true, but the Court makes that the basis for its reasoning or its decision. Insofar as the result of the changes is for no airport to sign up, not many have signed up before the change, right? In any event, no additional airports sign up. It just means that your business model is not revenue from advertising. It's revenue from your patent. We would prefer that it be revenue from the patent, but we did have a business model that was working. We were in the process. But you prefer it be from the patent infringement. We certainly hope that. You're in Phat City, right? If we prevail, then yes. But what has happened is the government has continued to infringe the patent and then taken. . . So the government is continuing to infringe the patent, and then it has taken action with regard to the MOU that has prevented any airport operators from signing up and doing this. So now Security Point has no possibility of revenue given the actions that was taken by the government. So your best case is you win on the patents. Your second best case is that the government gets out of the way and you have an ongoing advertising business. I think that's very. . . And the worst case is that you lose on the patents. That's correct. But what we have here is a situation where the government has cut us off completely. So thank you very much. Thank you.
judges: Henderson, Srinivasan, Ginsburg